UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | CR No. 16-011 JJM |
| | ) | |
| JASON BOUDREAU | ) | |

_____

SENTENCING MEMORANDUM

Jason Boudreau is a very smart man. He is educated, he has a college degree, and he keenly understands much of the law as it pertains to him. He is also bright enough to understand that he has a problem and that he needs help. This is a subsequent sex offense for Mr. Boudreau and therefore he faces a mandatory 10 year prison sentence. The hope is he can receive proper treatment within the Bureau of Prisons ("BOP") during his sentence so that he can appropriately manage his behavior when he transitions into the community on supervised release. The 10 year mandatory prison sentence adequately satisfies the purposes of sentencing and the Court should impose no more incarceration.

Mr. Boudreau has shown complete amenability to treatment. Prior to this arrest he was in sex offender counseling at Counseling Services of Rhode Island in Warwick. He was fully engaged in the process and progressing with treatment when he was arrested in December 2015. Since his arrest he has been engaged in sex offender

counseling and other extensive programming at the Wyatt facility.[1] Mr. Boudreau has been steadfast in his desire to correct his behaviors and better himself. To be clear, Mr. Boudreau has failed in his previous efforts. He has been on probation before, participated in counseling before, but then reoffended. Despite his past failures, he has never stopped engaging with treatment and trying to better himself.

The success of this sentence for Mr. Boudreau will be defined by his future performance in the community while on supervised release. He has been motivated in counseling, and is eager to continue. This time, he will also have the support and supervision of the Federal Probation Department. He will be supervised for a significant amount of time – from 5 years to life – and the intensity and conditions with which that comes ought to make all of the difference. Mr. Boudreau understands that his conduct has been abjectly unacceptable and that he needs to work harder to manage his behavior.

Despite being prosecuted here by the government and carrying the stigmatic label of sex offender, Jason Boudreau is a loving and caring father to his three children. When not in custody he was completely engaged with them, cared for them and helped raise them, and provided support for them. He is deeply aware of the milestone

---

[1] Mr. Boudreau has participated in many classes during his detention, including anger management, substance abuse, addiction issue, sex offender treatment, bio-hazard clean-up, victim impact, and cognitive behavioral therapy. Several of his completion certificates are attached (Exhibit A), as is a letter from a Wyatt counselor noting his positive involvement (Exhibit B). The Court should particularly note his several certificates for working as a facilitator and leader in the sex offender program.

moments in their lives that he has missed due to his incarceration, including graduations and the birth of his first grandchild. While he has suffered in not witnessing these occasions, he knows that his children are likewise suffering with his absence due to his misbehavior. The effect his conduct has had on his children is a source of motivation for Jason to work harder on his rehabilitation.

**Mandatory Prison Sentence**

The statute requires the Court impose a sentence of at least 10 years in prison upon Mr. Boudreau. PSR ¶ 88. The basic statutory penalty for possessing child pornography is enhanced to the 10 year mark because this is a subsequent sex offense. Congress valued the certainty of punishment over the discretion of district judges in these situations. The reasons why Mr. Boudreau committed these offenses become irrelevant considering the severe mandatory sentence. The unfortunate reality is that he did re-offend and therefore earned the mandatory 10 year penalty. What is relevant, however, is the sheer severity of 10 years in prison which overcompensates for the necessary punishment to address Mr. Boudreau's actual conduct. The prison time imposed will mean nothing as far as resolving his behavioral issues; only intense therapy can help him control his behavior.

**Sentencing Guidelines**

The 188 to 235 month advisory guideline range in this matter greatly overstates the seriousness of the offense, especially when considering the existence of the harsh mandatory minimum sentence. The calculation suffers from several shortcomings inherent in the sentencing guidelines for child pornography offenses. The advisory guideline range includes several enhancements for conduct germane to the possession of child pornography. For example, here there is a 2 level enhancement for the possession of pre-pubescent content (PSR ¶ 27), there is a 2 level enhancement for the use of a computer (PSR ¶ 30)[2], and a 5 level enhancement for the number of images possessed (PSR ¶ 31)[3]. Each of these enhancements are applied in virtually all child pornography cases. *See* United States Sentencing Commission, <u>2012 Report to Congress: Child Pornography Offenses</u>, at 316 (these enhancements were applied in over 96% of cases in 2010) ("USSC 2012 Report"). The purpose of the several enhancements in the guidelines is to differentiate the mine-run case from the exceptional. Applying enhancements in a particular case for typical/common/germane

---

[2] The Commission created the computer use enhancement pursuant to 1995 legislation. As an enhancement, this assessment provided the potential for extra punishment if certain facts appeared in a case beyond the normal circumstances. The particular aggravating fact being the use of a computer. The initial purpose for the enhancement – to address an atypical factor - does not make sense now more than 25 years later. Child pornography cases today are far different.

[3] Sentences for child pornography possession had been originally influenced by the number of items possessed, not the number of images. An item in the early 1990's could be a magazine, a film, a video tape, a periodical, etc. *See* U.S.S.G § 2G2.4 (1992). Ten or more items resulted in a 2 point enhancement. That rule remained constant until the changes put in place by the Protect Act in 2003. A child pornography possession sentence is now influenced by the number of individual images possessed rather than each conduit being treated as a single item. An individual who had 5 VCR tapes (5 items) would not have been subject to any enhancement in the past, but, since 2003, 5 tapes would convert into 375 images for sentencing and a 4 level increase. This change came from congressional directives, not from any empirical study.

facts found in all cases lacks logical reasonableness because the enhancements no longer cover exceptional circumstances.[4] The Court, therefore, should not give great weight to these enhancements and the resulting advisory sentencing range.

### Guidelines not tied to Institutional Study or Practice

The Court also needs to consider that the sex offense sentencing guidelines were not promulgated or developed by the Sentencing Commission in its envisioned characteristic institutional role. There is no study of sentencing efficacy or rehabilitation efforts forming a foundation for these guidelines. They were created in an office, or perhaps a conference room, rather than in a courtroom. They are founded on congressional policy directives based on morality judgments, rather than created by practitioners or through the Sentencing Commission's study of sentencing practices.[5]

---

[4] Absent these three particular enhancements Mr. Boudreau's offense level would drop by 9, resulting in an advisory guideline range of 77 to 96 months in prison, though he is subject to the 10 year mandatory minimum sentence regardless.

[5] For example, the original sentencing guidelines included a section addressing the production, transportation, trafficking and receipt of child pornography. U.S.S.G. § 2G2.2 (1987). Simple possession of child pornography was not a federal crime. The guidelines, and the 1988 revision, set a base offense level for this conduct at 13 and included enhancements for a prepubescent subject (+2) and distribution (+5, or more if of high value). See U.S.S.G. § 2G2.2 (1987) & (1988).

In 1990 Congress criminalized possession of child pornography and set higher maximum penalties for certain child pornography crimes. The Commission, in response, created a guideline structure for possession crimes, as well as adjust its existing framework for trafficking crimes to account for the higher statutory penalties. The Commission created U.S.S.G. § 2G2.4 to cover the crimes of possession, transportation, and receipt of child pornography which included enhancements for the separate offenses and a cross reference to § 2G2.2 if the conduct was related to trafficking. See U.S.S.G. App. C, Amend 372 (1991). Other enhancements were also created for various aggravating circumstances. The Commission explained its actions to Congress in an August 7, 1991, letter:

It is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices

> under the guidelines - information that we hope Congress will consider in its decision on sentencing policy... The Commission's guidelines, taking into account proposed amendments we recently sent to the Congress for its review, continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice.

In fact, a number of judges had written the Commission to express the view that the offense level for the least serious forms of conduct under § 2G2.2 was too severe and that the Commission had failed to consider mitigating factors that warranted a lower sentence.  Empirical data on non-distribution cases sentenced under § 2G2.2 during fiscal year 1990 suggest many judges share this view of sentence severity. Data indicates that 34 of 88 such cases were sentenced below the appropriate guideline range. This 38 percent below-guideline sentencing rate is more than two and one-half times the 14.4 percent downward departure rate for all guidelines in the same period. Moreover, there are indications that many prosecutors may share the judges' views, based on the fact that apparently only three such downward departure sentences have been appealed. 137 Cong. Rec. H6736-02.

The new guideline for simple possession of child pornography set the base offense level at 10 and included a 2 level enhancement if the subject was a prepubescent child.  *Id.*

In response to the proposed guidelines (Guideline Amendment 372), Senator Jesse Helms introduced an amendment into an appropriations bill which would direct the Commission to change the child pornography guidelines and increase sentences again.  See Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992, 137 Cong. Rec. S10356-01, S10363 (Amendment 780). Sen. Helms commented on the record:

> The Sentencing Commission recently, for some unbeknown reason, decided to reduce the sentence for these smut peddlers so low that most of these convicted smut peddlers and pedophiles will receive, at most, probation.... The amendment instructs the Sentencing Commission to increase the penalty for child porn offenses so that offenders will serve at least some time in jail. *Id.*

The appropriations bill ultimately passed without any debate on the amendment, but it is clear that the Helms amendment was simply a rejection of the Commission's reasoned empirical study of child pornography sentencing in favor of general moral judgments that pedophiles need consistently more severe sentences. This type of unsubstantiated increase in the guidelines is precisely what *Kimbrough* warns against.

Following Congress's desires, the Commission increased the offense levels in both §§ 2G2.2 & 2G2.4. Guideline Amendment 436 raised the base offense level for simple possession of child pornography to 13 and included for the first time an enhancement for the number of pornographic items (+2 levels if 10 or more items). U.S.S.G. App. C, Amend 436 (1992). This higher offense level was equal to the prior base offense level for trafficking child pornography. Compare U.S.S.G. § 2G2.4 (1992) with U.S.S.G. § 2G2.2 (1991). As stated, this increase did not correspond with any empirical study justifying the increase as necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a).

In 1995, Congress again decided to increase penalties for child pornography crimes.  Initially the aim was to direct the Commission to increase offense levels for trafficking and production crimes. Additionally, Congress was concerned that the expansion of the internet and home computers was making it easier to traffic child pornography. See U.S.S.C. Report to Congress, Sex Offenses Against Children, 25-27 (June, 1996). The final legislation, however, extended to all child pornography offenders, possessors as well as traffickers and producers. As a result, the Commission increased the base offense level for possession of child pornography to 15 and added a new 2 level enhancement for using a computer in connection with the possession. U.S.S.G. App. C, Amend 537 (1996).

6

Guidelines based on policy alone are therefore worthy of less respect and consideration from the Court. *Kimbrough v. United States*, 552 U.S. 85, 100-02 (2007). In this instance the Court ought to give the advisory guideline range little consideration. The Court must – and should – impose a prison sentence in this case, but the advisory guideline range has no reasonable relation to Mr. Boudreau's conduct.

---

In 2003, Congress passed the Protect Act which included additional directives to the Commission for changes to §§ 2G2.2 & 2G2.4. The Protect Act eliminated the possibility of most downward departures for child pornography defendants, and added two aggravating enhancements to § 2G2.4. See U.S.S.G. App. C, Amend. 649 (2003). First, a 4 level enhancement was included for possession of pictures which depicted sadistic or violent content. Id. Also, the structure for enhancements based on the number of pictures possessed was retooled. Instead of a blanket 2 level increase for 10 or more items, the enhancement was now based on individual images: +2 levels for 10-150 images, +3 for 150-300, +4 for 300-600, and +5 for over 600. Id. The Court must note that Congress passed this legislation, directing these changes, without consulting the Sentencing Commission. See Skye Phillips, Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence, 12 J.L. & Pol'y 947, 983, n. 185, 986 (2004). In fact, Congress wrote the new guideline language itself rather than allowing the Commission to perform its own function.

In 2004, the Commission reworked the two child pornography guidelines. See U.S.S.G. App. C, Amend. 664 (2004). It merged the guidelines into the current § 2G2.2 which sets separate base offense levels for simple possession as opposed to trafficking and production. The Commission also, however, increased the base offense level, again, for possession cases from 15 to 18. The reason for the increased base level was not to support the statutory sentencing purposes per 18 U.S.C. § 3553(a), but merely to equate the guideline ranges with the mandatory minimum sentences put in place by the Protect Act.

Again, contradictory to the holding in *Kimbrough*, the Commission did not consider these detailed changes from its own perspective as the designated sentencing experts, but merely endorsed Congress's unstudied opinions. When the Commission creates sentencing guidelines without acting in its characteristic institutional role, the Court must evaluate the suggested guideline range closely. A guideline based on congressional emotion - "smut peddlers and pedophiles" - and not on study of the most effective ways to sentence offenders to reduce recidivism, is not a recommendation to which the Court should give much consideration. Congress created and tasked the Sentencing Commission to be the expert institution dealing with all sentencing issues. With regard to the guidelines covering the possession of child pornography, however, Congress did not allow the Commission to complete its mission.

### The Bureau of Prisons and "Financial Responsibility"

The BOP, as part of its over-all duty to manage the incarceration of federal prisoners, encourages all inmates to meet their financial obligations by participating in the voluntary "Inmate Financial Responsibility Program". *See* Bureau of Prisons Program Stmt. P5380.08, 8/15/2005 (Exhibit C). While that may sound productive and appropriate, the program is only aimed at collecting monies for court orders. The BOP does not *encourage* the inmate to send money home to support his family or attend to other responsibilities, only to address fines, restitution, and assessments. Also, while promoted as a "voluntary" program, the BOP presents a panoply of punishments should an inmate decide not, or become "unable", to participate. For example, an inmate who fails to participate will:

- lose any possible furlough time;
- not receive any performance or bonus pay;
- not be allowed to participate in work outside of the BOP facility or in any UNICOR assignments;
- have limited commissary access;
- be assigned to the lowest level of housing (comfort, not security);
- be restricted from all community confinement programs; and
- not receive incentives for participating in certain programming, like the RDAP.

*See* Exhibit C at 11-13. Plainly the program is voluntary only by threat of additional punishment.

8

**Financial Assessments for Mr. Boudreau**

As detailed in the PSR, the Court can impose an additional monetary assessment upon Mr. Boudreau. *See* PSR ¶ 99.[6] The extra assessment of $5,000, pursuant to 18 U.S.C. § 3014, is the result of "The Justice for Victims of Trafficking Act of 2015". This assessment may be applied in sex offenses, but it is not mandatory. The assessment is subject to the Court's determination that Mr. Boudreau has sufficient assets to pay it. Specifically, the Court must find that Mr. Boudreau is not indigent in order to impose the $5000 assessment. 18 U.S.C. § 3014(a). In fact, Mr. Boudreau is indigent and does not - and will not - have the ability to pay a $5,000 assessment. He is a 47 year old man with few assets. He will be imprisoned until his mid 50's with little if any job prospects. He has no ability to pay this extra assessment and the imposition will only result in Mr. Boudreau's additional punishment under the BOP financial responsibility program. The Court should not impose this extra assessment.

**Restitution**

The statutes require the Court to order restitution to victims in child pornography cases who have suffered harm proximately caused by the defendant's actions. *See* 18 U.S.C. §§ 2259, 3663 & 3663A. Although such victims are not required

---

[6] The $100 special assessment is mandatory under 18 U.S.C. § 3013 for all felony convictions and not in dispute here.

9

to participate in restitution proceedings (18 U.S.C. § 3664 (g)(1)), they must make a request and present evidence of losses and expenses in support of their claim (18 U.S.C. § 2259(b)(2)(C) & (c)(2)). The evidence supporting a claim is included in the pre-sentence investigation for the Court to consider when determining the restitution award. 18 U.S.C. § 3664(a) ("The report shall include, to the extent practicable, a complete accounting of the losses to each victim…"). The amount of restitution is based on the *demonstrated* losses and costs incurred by each victim. *See* 18 U.S.C. § 2259. While the statutes require restitution (*see* 18 U.S.C. §§ 2259, 3663 & 3663A), the Supreme Court decided the amount of restitution in a child pornography case must reflect "the defendant's relative role in the causal process that underlies the victim's losses". *Paroline v. United States*, 572 U.S. 434, 458 (2014). There is no set formula to determine a defendant's share of a particular victim's losses, but Congress has set the floor of such restitution awards at $3000. 18 U.S.C. § 2259(b)(2)(B). Based on the information presented by the victim, through the government, the Court determines if any award above $3,000 is warranted.

In this case, Mr. Boudreau's relative share of losses for any victim is not great. His connection to the victims seeking restitution is considerably attenuated and his responsibility for losses is therefore very small. *See Paroline*, 527 U.S. at 458-59. His only connection is his possession/viewing of the images. Mr. Boudreau did not produce these pictures, is not responsible for any of the physical abuse, and has had no contact whatsoever with the victims. He is simply one of thousands of individuals who have

viewed these pictures on the internet. He is simply one of thousands of persons bearing some responsibility for this harm. The Court, therefore, should order only a minimal amount of restitution to any of the victims in this matter.

A total of 7 people have requested restitution in this matter. Each circumstance is essentially the same. These individuals suffered horribly at the hands of their abusers who documented that abuse by photo or video, and then shared that abuse over the internet. None suffered any direct harm from Mr. Boudreau.

The first group of restitution requests come from three sisters identified as Pia, Ava, and Mya. Their counsel, Debra Bianco, has provided a written request which details their abuse and how they are now receiving treatment for that abuse. Their counsel asks for $5,000 each in restitution. They do not provide any actual evaluations or assessments, or any explanation as to how Mr. Boudreau specifically harmed them. They simply assert that Mr. Boudreau viewed the pictures/videos of their abuse. That level of involvement warrants, by statute, the minimum restitution order of $3,000 each. There is no additional information showing any aggravation of Mr. Boudreau's conduct or distinction from anyone else who happened to view this content on the internet. There is no basis for any greater restitution.

The second group includes Erika and Tori, and their counsel (Marsh Law Firm) requests $25,000 in restitution for each girl. The basis for that request was Mr. Boudreau's viewing/possession of images of their abuse, nothing more. Their counsel arrives at the $25,000 figure based on a 2014 proposed law setting that minimum

amount for restitution in child pornography cases. That law was never passed and therefore provides no real support for the request. Instead of passing that proposal, Congress set the minimum restitution amount at $3,000 in 2018. *See* 18 U.S.C. § 2259. Regardless, counsel fails to present any other information in support of the $25,000 request. Mr. Boudreau's conduct, in fact, was neither personal nor particular to Erika or Tori, and there is no basis for any restitution amount above the required minimum $3,000.

The request for Jenny (Marsh Law Firm) also asks for $25,000. There is no information as to how Mr. Boudreau proximately caused harm save for his possession of the images. Counsel includes an evaluation of Jenny's circumstance, but that does not include any information supporting the restitution request as to Mr. Boudreau. Counsel again relies on the 2014 failed legislation for support. The presentation, however, fails to adequately justify the $25,000 request. The minimum mandatory restitution order of $3,000 is appropriate.

Last, June requests $25,000 in restitution through counsel (Marsh Law Firm). Counsel includes evaluations and economic estimates to support the assertion of harm, but there is no information regarding Mr. Boudreau's particular conduct. Counsel again presents the 2014 failed legislation for support. Again, Mr. Boudreau's conduct requires the $3,000 restitution order, but does not warrant or justify any additional amount.

**Additional Punishment**[7]

The imposition of a prison sentence contemplates the removal of an individual from society for a period of time as the actual punishment. Additional conditions which make day to day prison life miserable and unsafe, and only serve to dehumanize the person exist outside of the intent of incarceration. The Court needs to consider the extent of these horribles in order to measure the harshness and severity of its sentence. For example, the severity of incarceration has been particularly acute during the COVID 19 pandemic. Since March of 2020 inmates everywhere have been subject to increased restriction and confinement, separation from family and visitors, and the threat of the virus in a densely populated environment. Those conditions have added to the normal harshness of incarceration. Mr. Boudreau has fully experienced the negative aspects of incarcerated life during the pandemic.

As a sex offender, Mr. Boudreau will bear other significant punishments as he serves his sentence. His placement within the BOP will be limited due to his offense. He will be a target for other inmates because he is a sex offender. He will be classified at a higher security level. He will not be afforded the opportunity to participate in programs which grant extra good time or privileges.[8] He may also be subject to a period

---

[7] Mr. Boudreau also has a pending sentencing in CT state court. *See* PSR ¶51.
[8] Sex offenders are statutorily excluded from these benefits established by the First Step Act. 18 U.S.C. § 3632 (D) (xxvii – xliii).

of civil commitment by the government after he completes this criminal sentence. His incarceration will be harsher and more severe than most federal prisoners.

After his prison sentence, Mr. Boudreau will be subject to a longer and more rigorous period of supervised release. He will receive a minimum probationary period of 5 years with a maximum of lifetime supervision. He will be required to engage in sex offender treatment. He will be subjected to sexual interviews and polygraph testing. He will be subject to searches by law enforcement with less than probable cause. His supervision will be intensive.

Lastly, Mr. Boudreau will be declared and labeled a sex offender. He will be required to register with authorities where he lives, works, or attends school – probably for the rest of his life. His housing will always be limited. His employment – if he can find work – will always be limited. His travel will always be limited. He will never be trusted. He will be a second-class citizen.

**A Minimally Sufficient Sentence**

The law directs the Court to impose a sentence which is the least restrictive means to promote the purposes of sentencing, including just punishment, deterrence, protection of the public, and rehabilitation. 18 U.S.C. § 3553(a) (the parsimony directive). Here Mr. Boudreau is subject to the lengthy mandatory 10 year prison term. Such a sentence well covers what is necessary under § 3553(a).

14

A 10 year prison sentence is a severe penalty. That period is a significant chunk of a normal lifetime. While severe, Mr. Boudreau will have ample time to participate in sex offender treatment within the BOP, which supports his rehabilitation. His opportunity to participate in meaningful treatment ought to be the main point of any prison sentence he receives. Additional time in custody for the sake of punishment would not be productive; it would simply be a waste of time and resources.

Regarding deterrence, the sentence imposed upon Mr. Boudreau will have little or no general effect. Child pornography sentences have been increasingly severe for many years with little deterrent impact. Indeed, the consistent stream of child pornography cases charged here in this district and across the country points to a much larger problem in society that the criminal justice system simply cannot change through the imposition of imprisonment. Particular to Mr. Boudreau, the 10 years sentence provides an ample lesson. He has never been incarcerated this long before, he does not want to spend more time in prison, and he greatly desires to be out of custody to be the father to his children he has always aspired to be.

On protecting the public, the mandatory minimum sentence here will best suffice. Sheer time in custody does not equal protection. The length of time spent in prison must be balanced against the negative impact of custody on the individual to ensure he is not worse off in society than before the imprisonment. For Mr. Boudreau, the more time he spends in prison the more his personal foundation in the community will deteriorate, and the more negative situations he will experience. Upon release he

15

will be older, obviously, and less able to rebuild his life, let alone deal with residual prison trauma. His reduced capacity to provide and care for himself can push him more to the margins of society, where recidivism is more likely. No one benefits from Mr. Boudreau being put in that position. The mandatory sentence here, 10 years is prison provides the most protection for the public possible in these circumstances.

Given this 10 year prison sentence, Mr. Boudreau will be well into his 50's by the time he is released and under intense federal supervision. Despite this instance being a subsequent offense, his likelihood to further recidivate approaches zero given his age and continued treatment. The court should impose no more than the 10 year mandatory minimum period of incarceration for Mr. Boudreau because this sentence best satisfies the § 3553(a) factors in accordance with the statute's parsimony directive.

Respectfully submitted
Jason Boudreau
By his attorney,


/s/ Kevin J. Fitzgerald, 5775
Assistant Federal Defender
10 Weybosset St., Ste. 300
Providence, RI 02903
(401) 528-4281
FAX 528-4285
kevin_fitzgerald@fd.org

CERTIFICATION

I hereby certify that a copy of this motion was delivered by electronic notification to Denise Barton, Assistant United States Attorney, on XXXX.

/s/ Kevin J. Fitzgerald